MARTIN MUCKLEROY
MUCKLEROY LUNT
6077 S. Fort Apache Road, Suite 140
Las Vegas, NV 89148
Telephone:     (702) 907-0097
Facsimile:     (702) 938-4065
martin@muckleroy.com

ROBERT C. SCHUBERT
WILLEM F. JONCKHEER
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone:     (415) 788-4220
Facsimile:     (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ED LOMONT and LUIS ANGULO, derivatively on behalf of nominal defendant Workhorse Group, Inc. | No. |
| | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Plaintiffs, | |
| | Jury Trial Demanded |
| vs. | |
| DUANE HUGHES, STEVE SCHRADER, ROBERT WILLISON, STEPHEN FLEMING, ANTHONY FUREY, RAYMOND CHESS, GERALD BUDDE, H. BENJAMIN SAMUELS, HARRY DEMOTT, MICHAEL CLARK, PAMELA MADER, and JACQUILENE DEDO, | |
| Defendants, | |
| -and- | |
| WORKHORSE GROUP, INC., | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Ed Lomont and Luis Angulo ("Plaintiffs") bring this shareholder derivative action on behalf of nominal defendant Workhorse Group, Inc. ("Workhorse" or the "Company"), a Nevada corporation. Plaintiffs' allegations are based upon personal knowledge as to Plaintiffs and on information and belief as to all other matters. Plaintiffs' information and belief is based upon the investigation conducted by and under the supervision of counsel which included, among other things, a review and analysis of: (a) Workhorse's public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) articles in the news media and analyst reports; (c) the Company's website and press releases; (d) complaints and related materials from other litigation involving Workhorse; and (e) applicable rules and regulations.

## NATURE OF THE ACTION

1. This is a shareholder derivative action on behalf of nominal defendant Workhorse against certain of its current and former officers and directors seeking to remedy defendants' breaches of fiduciary duties and for contribution and indemnification.

2. Workhorse builds electric delivery trucks and drone systems and is based in Loveland, Ohio. In January 2015, the United States Postal Service ("USPS") announced its Next Generation Delivery Vehicle ("NGDV") project, which aimed to replace about 165,000 aging package delivery vehicles as part of a multi-billion dollar contract. On October 16, 2015, USPS issued a Prototype Request for Proposal to 15 prequalified suppliers, and out of these proposals six suppliers were chosen to create prototypes. Workhorse's predecessor entity submitted a proposal, but the bid was rejected because its engineers could not use the design software mandated by USPS.

3. However, in order to stay in the running for the contract, Workhorse then partnered with one of the chosen suppliers, VT Hackney, to create prototypes for testing by the USPS in the next phase of the bidding process. VT Hackney eventually dropped out and in November 2019 sold its right to bid on the USPS contract to Workhorse for $7 million.

4. As alleged herein, Workhorse had never secured nor performed a contract as large as the NGDV contract. In fact, for most of its existence back to 2007, Workhorse had incurred substantial losses. As of December 31, 2020, the Company had accumulated a deficit of $109

million. In addition, the Company has had significant negative cash flow from operating activities, including a negative cash flow of $70.3 million in 2020.

5.      Nevertheless, during the relevant period, Workhorse's officers and directors began a sustained campaign of false and misleading statements regarding the likelihood of Workhorse securing the lucrative USPS contract. They created the impression that Workhorse was a legitimate contender to do so, even while they knew that Workhorse did not have the operational nor manufacturing capacity to execute on the scale required.

6.      Defendants' campaign of false and misleading statements regarding Workhorse's prospects caused the Company's stock price to rise dramatically. Between March of 2020 and February of 2021, Workhorse's stock price soared from just $2 per share to over $40 per share – a period during which the Company's officers and directors promptly sold over 2.6 million of their personal shares for proceeds of over $61 million.

7.      On October 8, 2020, *Fuzzy Panda Research,* a short seller research firm, issued a report entitled *The "Brakes" Fall Off The USPS Story: Workhorse's USPS Bid has Numerous Critical Failures*. The report revealed that the Company's partner to the NGDV bid, VT Hackney, dropped out and sold its bidding rights to Workhorse because of numerous problems with the prototype they had developed, including a parking brake failure resulting in a USPS employee being injured during testing. The report further disclosed that a purported backlog of orders for Workhorse vehicles based on other contracts was largely illusory.

8.      On February 23, 2021, USPS announced that it was awarding the entire contract to another bidder, causing Workhorse's stock price to plummet. Analyst Wolfe Research issued a note that day explaining that "[g]iven recent indications from the Postal Service that the contract could be split between multiple OEMs, and given President Biden's new EV [electric vehicle] mandate for the Federal Fleet, investors were clearly surprised by this outcome." Wolfe Research underscored that the revelation "raise[d] questions about underlying issues with WKHS's product/technology."

9.      The truth more fully emerged on May 10, 2021, when Workhorse announced its financial results for the first fiscal quarter ended March 31, 2021. Workhorse revealed that it had

Verified Shareholder Derivative Complaint

1    only produced six vehicles in the first quarter of 2021 and 38 vehicles year-to-date. These figures

2    made clear that the Company did not have the manufacturing capacity to even compete for the

3    USPS contract, much less win it, and threw into doubt the Company's representations that it

4    could execute on a backlog of orders it claimed to have from other contracts.

5         10.    On or about March 8, 2021, investors seeking to recoup their losses in Workhorse

6    stock sued Workhorse and certain of its officers and directors for violations of the federal

7    securities laws in the U.S. District Court for the Central District of California, and a consolidated

8    complaint was filed on July 16, 2021. By order dated December 2, 2021, U.S. District Judge

9    Cormac J. Carney denied the motion to dismiss, holding that investors had stated actionable

10   claims against the Workhorse defendants under the heightened pleading standards of the Private

11   Securities Litigation Reform Act of 1995.

12        11.    Judge Carney held that the class action plaintiffs alleged with particularity that

13   the Workhorse defendants made false and misleading statements regarding the Company's

14   ability to secure the USPS contract, its manufacturing capabilities, and the purported backlog of

15   orders from other contracts, and that the defendants acted with scienter, or intent to defraud. The

16   class action has exposed the Company to massive liability for securities fraud. In addition, the

17   Company has disclosed that it has received inquiries regarding these matters from the SEC and

18   the U.S. Department of Justice, raising the prospect of regulatory fines and penalties.

19        12.    As alleged herein, Workhorse was never able to mass produce trucks, as its

20   primary assembly facility was understaffed and had no automation. In addition, Workhorse's

21   purported backlog consisted of conditional agreements with entities that had no fixed obligation

22   to take delivery of the trucks. Additionally, Workhorse knew early on based on negative

23   feedback from the USPS that the NGDV contract would likely not be awarded to Workhorse.

24        13.    Shareholder value has been severely damaged by defendants' misconduct. By

25   causing the Company to issue false and misleading statements, each defendant named herein

26   who served as a director acted in bad faith and faces a substantial likelihood of liability for breach

27   of fiduciary duty. Under these circumstances, any demand on the Workhorse board of directors

28   to bring the asserted claims would be futile, and is therefore excused.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

14.     This action seeks to recoup losses that Workhorse has sustained, and will continue sustaining, in connection with defendants' misconduct.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise federal questions.

16.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c) and (d). Workhorse and the individual defendants have conducted business in this District and/or their actions have had an effect in this District. The Court has personal jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in this District or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction permissible under traditional notions of fair play and substantial justice.

18.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

## THE PARTIES

**Plaintiffs**

19.     Plaintiff Ed Lomont is a current shareholder of Workhorse common stock and held Workhorse shares continuously during the relevant period.

20.     Plaintiff Luis Angulo is a current shareholder of Workhorse common stock and held Workhorse shares continuously during the relevant period.

**Nominal Defendant**

21.     Nominal Defendant Workhorse is a Nevada corporation with its principal executive offices located at 100 Commerce Drive, Loveland, Ohio 45140. Its shares trade on The NASDAQ Capital Market under the ticker symbol "WKHS."

**Individual Defendants**

22.     Defendant Duane Hughes served as the Company's CEO and as a director from February 2019 until August 2, 2021. Hughes replaced Stephen S. Burns ("Burns"), who had

served as the Company's CEO since 2009. Previously, Hughes served as the Company's COO and President from August 2016 until January 2019. While in possession of material, nonpublic information concerning Workhorse's true business condition, Hughes sold 568,502 shares of stock for $14,399,122.23 in proceeds. In 2020, Hughes earned $450,000 in salary, $475,000 in stock awards, and $384,750 in non-equity incentive plan compensation.

23.     Defendant Steve Schrader served as the Company's CFO from December 2019 until September 29, 2021. While in possession of material, nonpublic information concerning Workhorse's true business condition, Schrader sold 15,152 shares of stock for $332,131.84 in proceeds.

24.     Defendant Robert Willison served as the Company's COO from February 19, 2019 until September 30, 2021. While in possession of material, nonpublic information concerning Workhorse's true business condition, Willison sold 169,920 shares of stock for $4,825,492.80 in proceeds.

25.     Defendant Stephen Fleming served as the Company's Vice President and General Counsel from November 2019 until November 2021. While in possession of material, nonpublic information concerning Workhorse's true business condition, Fleming sold 304,796 shares of stock for $6,614,781.05 in proceeds.

26.     Defendant Anthony Furey has served as the Company's Vice President of Finance since November 2019. While in possession of material, nonpublic information concerning Workhorse's true business health, Furey sold 201,862 shares of stock for $4,407,915.04 in proceeds.

27.     Defendant Greg Ackerson has served as the Company's Corporate Controller and Principal Accounting Officer and joined the Company in 2018. While in possession of material, nonpublic information concerning Workhorse's true business condition, Ackerson sold 39,850 shares of stock for $965,000.00 in proceeds.

28.     Defendant Raymond Chess has served as a director since October 2013 and as Chairman of the Board since December 2015. While in possession of material, nonpublic information concerning Workhorse's true business condition, Chess sold 68,218 shares of his

1 stock for $1,428,218.48 in proceeds. During 2021, Chess was paid $167,916 in director fees and
2 stock awards.

3     29.    Defendant Gerald Budde has been a director since December 2015. While in
4 possession of material, nonpublic information concerning Workhorse's true business condition,
5 Budde sold 60,000 shares of his stock for $1,195,800 in proceeds. During 2021, Budde was paid
6 $119,167 in director fees and stock awards.

7     30.    Defendant H. Benjamin Samuels has been a director since December 2015. While
8 in possession of material, nonpublic information concerning Workhorse's true business
9 condition, Samuels sold over 1 million shares of his stock for proceeds of $24.4 million.  During
10 2021, Samuels was paid $119,167 in director fees and stock awards.

11     31.    Defendant Harry DeMott has been a director since September 2016. While in
12 possession of material, nonpublic information concerning Workhorse's true business condition,
13 DeMott sold over 112,000 shares of his stock for proceeds of over $2.675 million. During 2021,
14 DeMott was paid $119,167 in director fees and stock awards.

15     32.    Defendant Michael Clark has been a director since October 2018. During 2021,
16 Clark was paid $119,167 in director fees and stock awards.

17     33.    Defendant Pamela Mader has been a director since May 2020. While in
18 possession of material, nonpublic information concerning Workhorse's true business condition,
19 Mader sold 8,000 shares of her stock for $240,000 in proceeds. During 2021, Mader was paid
20 $119,167 in director fees and stock awards.

21     34.    Defendant Jacqueline Dedo has been a director since May 2020. During 2021,
22 Dedo was paid $119,167 in director fees and stock awards.

23     35.    The individuals named in paragraphs 22 through 34 herein are sometimes
24 collectively referred to herein as the "Individual Defendants."

25 **DIRECTOR AND OFFICER DUTIES**

26     36.    By reason of their positions as officers, directors, and fiduciaries of Workhorse
27 and because of their ability to control its affairs, each of the Individual Defendants owed
28 Workhorse and its shareholders fiduciary duties of care and loyalty in the management and

administration of Workhorse's affairs, as well as in the use and preservation of Workhorse's property and assets.

37.     As such, they were required to act in furtherance of the best interests of Workhorse and its shareholders and prohibited from engaging in self-dealing and unlawful corporate conduct, such as violations of the laws applicable to Workhorse and its business.

38.     As officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate complete, accurate, and truthful information regarding Workhorse's business, operations, management, and corporate conduct so that the market price of Workhorse stock would be based on truthful and accurate information.

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Workhorse, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.     The misconduct of the Individual Defendants involves a culpable violation of their obligations, the absence of good faith on their part, and a reckless disregard for the fiduciary duties owed to Workhorse and its shareholders, which they were aware or should have been aware posed a risk of serious injury to Workhorse.

41.     At all relevant times, each Individual Defendant was the agent of each other and of Workhorse, and was acting within the course and scope of such agency.

42.     In addition to these duties, the directors who served on the Audit Committee owed specific duties to Workhorse to assist the Board in overseeing "the Company's accounting and financial reporting processes...." The Audit Committee's Charter provides:

> **Audited Financial Statements**
>
> []Review and Discussion. The Audit Committee shall review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the matters about which Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU §380) requires discussion.
>
> []Recommendation to Board Regarding Financial Statements. The Audit Committee shall consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

[]Audit Committee Report. The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

**Review of Other Financial Disclosures**

[]Independent Auditor Review of Interim Financial Statements. The Audit Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Audit Committee and the Chief Financial Officer any matters identified in connection with the auditor's review of interim financial information which are required to be discussed by applicable auditing standards. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent auditor's review of interim financial information.

**Controls and Procedures**

[]Oversight. The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct. The Audit Committee shall receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Exchange Act.

**RELEVANT FACTUAL ALLEGATIONS**

**A. Background of the Company and the USPS Contract.**

43.     Workhorse manufactures electric delivery vans and software for the "last-mile" delivery sector — the last step of the delivery process where goods are transported by small or medium sized trucks from the distribution center to their final destination.

44.     Workhorse was founded in 1998 as a chassis manufacturer. A chassis is the load-bearing framework of a motor vehicle. In 2005, Workhorse was acquired by Navistar International ("Navistar"), a manufacturer of trucks and diesel engines. By 2011, however, Workhorse's business faltered and its manufacturing facility was shut down.

45.     Meanwhile, AMP Electric Vehicles ("AMP"), a vehicle electrification company established in 2007, worked with Navistar to electrify a 1,000-cubic foot delivery van. Although the development agreement between Navistar and AMP was never fulfilled. AMP later acquired Workhorse's assets and renamed itself Workhorse.

46.     On January 20, 2015, the USPS publicly announced its Next Generation Delivery Vehicle (NGDV) Acquisition Program with the issuance of a Request for Information (RFI) open to all interested suppliers. The NGDV program commenced a multi-year bidding process in which one or more suppliers would be awarded a multi-billion dollar contract to design and manufacture up to 165,000 new USPS mail delivery vehicles.

47.     The NGDV contract was an indefinite delivery, indefinite quantity ("IDIQ") contract, which allows the USPS to order more NGDVs over the contract period. The goal of the NGDV program was to begin replacing USPS's 215,000 vehicles, many of which were encountering breakdowns and heightened maintenance costs due to the fleet's age.

48.     On March 6, 2015, Workhorse was one of 34 companies to submit a proposal in response to the NGDV program. Non-party Burns, then-CEO of Workhorse, stated in a March 12, 2015 press release:

> We believe our approach to the NGDV could help the USPS reduce operating costs and increase efficiency as they move toward larger vehicles that can accommodate both mail and packages. The heavy stop-and-go nature of mail and package delivery, combined with the limited miles traveled per day, are ideal for our electric Workhorse truck. Additionally, our optional integrated HorseFly package delivery drone is designed to increase the number of packages that a truck can deliver in a day. Our technology has the potential to make the USPS the greenest, most efficient delivery fleet in the world while giving it the advantages it needs to improve its bottom line. With a one-time replacement of the largest fleet in the world, the USPS has a unique opportunity to redefine how delivery trucks operate and how they affect the air we breathe.

49.     Workhorse was one of 15 firms to make it past the initial review and into the first round of the USPS bidding process. However, Workhorse was soon rejected chiefly because it continued to create designs using AutoCAD software, even though USPS required bidders to submit designs using design software named SolidWorks.

50.     A company named VT Hackney, however, was selected as one of six prime suppliers to move on to the prototype development phase of the NGDV bidding process. Upon receiving the bid, VT Hackney CEO Mike Tucker said in a press release:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> We are excited to have been selected by the USPS as a bidder for building prototypes of the new design. As an independent truck body builder we are not constrained to any particular chassis and are able to select the best solution for the Postal Service's Next Generation Delivery Vehicle. Leveraging our 60 years of experience in unique and advanced storage and transport systems we are developing an advanced vehicle concept to meet the future needs of the USPS.

51.     The six selected suppliers each received a portion of $37 million to produce fully-operative prototypes that adhered to USPS's emissions and fuel economy, ergonomics, aesthetics, handling, and durability requirements. The prototypes were to represent various supplier ideas and driving configurations, and at least half of them had to feature hybrid and cutting-edge technologies such as alternative fuel capabilities.

52.     Each supplier was permitted to subcontract additional suppliers in order to develop its finished prototypes. In preparation to fulfill the prototype contract, VT Hackney subcontracted Workhorse to work on the USPS bid, although VT Hackney held the position as the primary contract bidder. VT Hackney is part of a large publicly traded aerospace, electronics, land systems, and marine company headquartered in Singapore.

53.     On September 22, 2016, Workhorse distributed a press release stating that the "exclusive" VT Hackney-Workhorse partnership had "been selected as one of six manufacturers awarded a prototype contract by the United States Postal Service (USPS) to build and deliver prototype vehicles for the Next Generation Delivery Vehicle (NGDV) Program." Workhorse added that it would provide the chassis and powertrain for the prototype vehicles, while VT Hackney would build the body.

54.     According to the USPS's solicitation materials, USPS would evaluate each proposal weighing its "total cost of ownership, technical evaluation results, and risk" to determine the "best value" to USPS.

55.     "Total Cost of Ownership" included consideration of factors such as acquisition costs, maintenance costs, and fuel costs. The "Technical Evaluation Factors" included "Design Quality and Technical Approach, Supplier Capability, and Past Performance, each of which comprised multiple subfactors."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

56.     In September 2017, VT Hackney and Workhorse jointly submitted six prototype vehicles for NGDV testing. However, according to the Fuzzy Panda Report, VT Hackney needed to enlist Detroit-based engineering company Prefix Corporation to finish the prototypes because Workhorse was incapable of doing the work itself.

57.     The prototypes fared poorly in testing. According to the Fuzzy Panda Report, "some of the more notable failures were their EV prototype ran out of range and got stranded on a road; suspension broke when hitting railroad tracks; chassis performance problems; extensive door failures; safety belt failures; motor failures; ran out of power on multiple occasions; and the parking brake failure that injured a USPS employee. . . ."

58.     VT Hackney subsequently decided to drop out of the project. On November 6, 2019, Workhorse announced that it had purchased VT Hackney's right to bid on the contract for approximately $7 million, and would be proceeding with the project.

59.     After the prototype testing phase completed in December 2019, the USPS commenced the next contract phase by publishing a request for proposals for the production of the NGDV vehicles. All contractors who had completed prototype testing – regardless of testing results – were eligible to submit proposals, which were due on July 14, 2020.

60.     On September 3, 2020, less than two months after Workhorse submitted its proposal, USPS Contracting Officer Delores B. Waters sent Workhorse a "Deficiency List" identifying various "weaknesses" in Workhorse's proposal, adding that the list was only representative of some of the problems, as it "indicated there were additional, unstated issues." The USPS's Deficiency list required Workhorse to submit a Deficiency Response, which it sent on September 25, 2020.

61.     On October 8, 2021, Workhorse representatives were invited to discuss the problems with its submission. On October 21, 2020, Waters sent another email to Workhorse identifying yet more issues related to Workhorse's proposal. The USPS inquiry required Workhorse to submit a response on October 28, 2020 to attempt to address these issues.

62.     On January 25, 2021, President Joe Biden announced his goal to replace the government's vehicle fleet with electric vehicles assembled in the United States. Thereafter,

Schrader conducted several interviews in which he suggested that President Biden's announcement was an indication that Workhorse was in an ideal position to be awarded the USPS NGDV contract. Schrader stated: "It's positive what we're seeing from the administration. President Biden, you know, just five days into his presidency has kind of pushed electric vehicles for all government agencies."

63.     On January 26, 2021, Workhorse tweeted "Thank you President Biden for your continued support for American-made Electric Vehicles. #workhorsegroup."

64.     However, on February 23, 2021, USPS announced via press release that it was awarding the entire NGDV contract to Oshkosh Defense ("Oshkosh"). The press release stated that "[t]he vehicles will be equipped with either fuel-efficient internal combustion engines or battery electric powertrains and can be retrofitted to keep pace with advances in electric vehicle technologies." The press release did not mention Workhorse.

65.     On February 24, 2021, Workhorse published a press release entitled "Workhorse Provides Corporate Update." The press release stated:

> On February 23, 2021 the USPS issued a press release announcing that it has made an award under the NGDV contract to a competing finalist.... After being informed of the USPS decision, the Company has requested, pursuant to the bid process rules, additional information from the USPS and is awaiting a response at this time. The Company intends to explore all avenues that are available to non-awarded finalists in a government bidding process.

66.     On June 16, 2021, Workhorse filed a complaint in the U.S. Court of Federal Claims against the USPS, challenging the USPS's decision to award the contract to Oshkosh. The complaint alleged that the USPS's actions with respect to procurement of the NGDV contract were "arbitrary, capricious, and without rational basis."

67.     The Workhorse complaint acknowledged that the USPS cited numerous reasons that USPS "would never have selected [Workhorse's NGDV] for its flagship vehicle[,]" the "posterchild" of which was a "roll-away incident[,]" in which "a flaw in Workhorse's parking brake system caused Workhorse's prototype vehicle to roll down an incline and into a ditch,"

1  resulting in the hospitalization of a USPS driver. Notably, this is the same incident identified in

2  the Fuzzy Panda Report.

3         68.     Although filled with broadsides against the USPS, Workhorse's complaint further

4  conceded that on at least two occasions, the USPS had informed the Company of various "areas

5  of deficiency," and had provided a "Deficiency List" that "identified issues" with Workhorse's

6  proposal, including questions regarding the Company's "prior performance," "Workhorse's

7  ability to manufacture efficient and sustainable all-electric vehicles for large-scale commercial

8  delivery[,]" and the "production capabilities of Workhorse's leadership and partners[.]"

9         69.     According to Workhorse's complaint, when the Company first challenged the

10  USPS's award to Oshkosh by written submission, the USPS responded with "a lengthy screed

11  aggressively attacking Workhorse," and its "lack of credibility and candor with the Federal

12  government." In addition, according to the Workhorse complaint, the USPS "castigated

13  Workhorse" for its public statements related to the Company's "participation in the NGDV

14  program" despite the Company having signed a strict non-disclosure agreement.

15         70.     Notably, some of the information disclosed in Workhorse's lawsuit echoes facts

16  uncovered by Fuzzy Panda in its October 8, 2020 report, wherein Fuzzy Panda disclosed the

17  results of visits to Workhorse's manufacturing facilities by its investigators:

18
19           NO Active purchase orders being worked on. Employees told us told that no purchase orders were currently in production for customers

20
21           "Show Units" – Employees at Union City, where 4 UPS branded trucks were parked behind dumpsters, referred to the units as "show units" and "prototypes"

22
23           NO Automation – All production at the facility still occurs MANUALLY without a sophisticated assembly line or any automation in place

24
25           NO Security – Workhorse employees invited us into both Union City Assembly Plant and the "secure" area of their Loveland R&D facility. They even let us photograph their old engine

26
27           All truck production and assembly occurs exclusively in Union City; the Union City plant is Workhorse's only production line and it is badly in need of additional capex investment

28

71.    The Fuzzy Panda Report contained information purporting to reflect conversations with Workhorse employees at its manufacturing facilities, again consistent with USPS concerns with Workhorse:

**Union City, Indiana – September 2020 Investigator invited inside Assembly Line Plant**

Investigator: Are those trucks for a particular customer?

Employee: No, those are just show units

Investigator: What does that mean like they are prototypes?

Employee: Yeah, they're not production

Investigator: Are you making any production units for customers right now?

Employee: No, not right now

Investigator: Is this the only facility where you make units or if there's another one on site?

Employee: No, this is the only production line

Investigator: How many of them they do make in a week or a month?

Employee: These are just the show units so they're not really doing that

**Loveland, Ohio – September 2020 Investigator Conversation within R&D facility:**

Employee: … really most of the production line is in Union City.

Investigator: Is it manual or automated? Here looks like everything is manual?

Employee: Here [Loveland] it's all manual, but there [Union City] it's all in a production line

Investigator: So there's automation there?

Employee: No, it's still manual, but it's more of a process there, here is more R&D.

72.    Workhorse filed a voluntary dismissal of its claim against the USPS on September 14, 2021, marking an apparent end to its pursuit of the USPS contract.

**B.  The Company's Other Purported Contracts.**

73.     Meanwhile, throughout the period that Workhorse was vying for the NGDV contract, the Individual Defendants were attempting to create the impression that Workhorse was an established company, including that it had signed material contracts and was capable of setting and meeting mass production targets of hundreds of vehicles per year.

74.     In 2018, Workhorse announced an agreement with United Parcel Service, Inc. ("UPS") for 1,000 all-electric package delivery vehicles. However, it is unclear what portion of this contract, if any, has been delivered or will be delivered, beyond a phase one production of 50 prototypes. In addition, a report published by UPS in 2019 indicated that UPS had placed an order for 10,000 EVs from a different manufacturer altogether.

75.     Nevertheless, Workhorse continued to tout is relationship with UPS in public statements. For example, on a May 6, 2020 earnings call, Schrader stated: "we have the backlog out there in the first place with UPS... we're seeing customers very positive about our trucks and it's more, how soon can we get them."  And on a November 9, 2020 earnings call, Hughes stated: "UPS remains our premier customer, if you will, because they have been along with us for the longest time, they collaborated with us on this C-Series design... So we feel strong. We are happy where we are with UPS. We will be delivering new vehicles. And the real key for them is us [delivering] a high-quality vehicle over and over again, right?... So the first vehicle we deliver them, we want to hit it out of the park, and we want to make sure it is right."

76.     In reality, from the outset and pursuant to the terms of the contract with UPS, the balance of the contract for 950 vehicles would occur "on a timeframe decided by Buyer at Buyer's sole discretion." In addition, UPS could "determine, at its sole discretion, the level of success of the 50 Vehicle test" and had the power to "reduce the quantity of the balance of the Order (or cancel the balance of the Order) depending on the level of success achieved during the phase 1 testing, as determined in Buyer's sole discretion."

77.     Likewise, on July 23, 2020, Workhorse published a press release that it had secured an order of 20 trucks from a "newly launched" electronic vehicle start-up named eTrucks. There is scant public information available regarding eTrucks and there is no evidence

that eTrucks has taken delivery of or paid for the 20 trucks mentioned in the July 23, 2020 press release.

78.     Similarly, on November 9, 2020, Workhorse announced that it had received a new purchase order of 500 trucks from Pritchard Companies, and on January 4, 2021, Workhorse announced that it had "received a purchase order for 6,320 C-Series all-electric delivery vehicles from Pride Group Enterprises." However, indications are that these orders are not firm commitments, and even the Company's most recent Form 10-K, filed on March 1, 2022, fails to provide meaningful information regarding these purported contracts.

79.     It is apparent that Workhorse management decided to showcase these purported contracts in their discussions with analysts, notwithstanding their contingent nature. For example, on May 28, 2020, an analyst from Dougherty & Company stated: "Certain large, national customers such as UPS engage directly with WKHS for larger orders; these large fleets typically have their own set of depots and staff for service functions... Our discussions with WKHS's management suggest that the company has approximately 1,200 vehicle orders in its backlog; most are for the C1000 model and are intended for delivery to UPS." In this fashion, the Individual Defendants were able to create a public narrative about the Company's prospects for success.

80.     The Individual Defendants also publicly set aggressive vehicle production targets to show they were capable of delivering on their contracts. In a press release dated March 10, 2020 concerning the Company's fourth quarter and full year 2019 financial results, the Company stated that it had "[e]stablished a production and delivery target of 300-400 vehicles in 2020." In the press release, Hughes stated:

> We also made meaningful progress in our transition from a development-stage company to a production-focused enterprise.... While our intent had been to deliver initial vehicles in the first quarter of 2020, we were impeded by material supply disruptions related to the global outbreak of the novel coronavirus. Despite these near-term headwinds, we are setting a 2020 production target of 300-400 vehicles and are looking forward to delivering our state-of-the-art truck to our customers.

81.     Similarly, on May 6, 2020, the Individual Defendants caused the Company to issue a press release reporting first quarter 2020 financial results. Included as a "Highlight" was the statement that Workhorse "[r]eaffirmed previous production and delivery target of 300-400 vehicles in 2020." Hughes stated the following:

> We will be delivering our C-Series vehicles to customers in the second quarter, and we remain on schedule to achieve our target of delivering 300 to 400 vehicles by the end of this year. To that end, we are in the final stage of preparing a detailed production plan of when we can deploy vehicles into Ryder Systems' sales channel starting in 2020 and into 2021.

82.     In an interview on July 24, 2020, Schrader stated: "We are actually making, um, actually making trucks right now at our Union City, Indiana plant, um, and, uh, and we plan to make 300-400 this year."

83.     A press release published by Workhorse on August 10, 2020 stated that the Company "reaffirmed previous production and delivery target of 300-400 vehicles in 2020."

84.     In an earnings call on August 10, 2020, Schrader stated: "the vast majority of our 300 to 400 vehicle production target would be manufactured and delivered by the end of the fourth quarter of this year" and Hughes stated that the Company was developing an assembly plan in order to "deliver our target vehicle production of 300 to 400 units later, with a vast majority coming in the fourth quarter."

85.     Similarly, on October 15, 2020, Schrader stated:

> Right now we've delivered, you know, a handful of vehicles out there but we have a plan to build and manufacture and deliver 300-400 this year, and most of those will come in this quarter right now, and then continue that to maybe 200 a month or so next year.

86.     And in an October 29, 2020 interview, Schrader stated: "we've got everything in place right now, so we've got the labor and materials coming in, and from our standpoint we still have the 300-400 that we have out there, and that's our goal."

87.     Remarkably, in an earnings call on November 9, 2020, Hughes set an *even larger* production target of 1,800 trucks in 2021. Hughes stated: "we would anticipate producing 1,800

1   units in 2021" and Schrader elaborated: "I think you could look at it as getting to 100 trucks per

2   month by the - no little later than the first quarter of 2021 and then getting to 200 trucks a month

3   by no later than the second quarter of 2021."

4        88.    As late as January 28, 2021, in another interview, Schrader stated: "our goal, our

5   milestone still is to try to have, you know, try to get to 5 a day sometime in March, by the end

6   of the first quarter, okay? Um, and then ten a day sometime by the end of the second quarter.

7   You know, so those are our milestones, and hopefully we hit those, um, but that's again if we hit

8   those then we should be on target for our 1,800 for this year." Workhorse made these statements

9   about its purported production volume even though there was no customer even available or

10   required to purchase the vehicles.

11        89.    Just a few months later, and after massive sales of stock by officers and directors

12   at prices inflated by their bullish statements about Workhorse's purported contracts and

13   production goals, on May 10, 2021, the truth was revealed when Workhorse announced that it

14   had only delivered six trucks in the first quarter 2021 and had only produced 38 trucks so far that

15   year, demonstrating that the 1,800 truck target announced just a few months before was wildly

16   off-base. On this news, the price of Workhorse stock dropped to a low of $8.20 per share.

17        90.    In July 2021, Workhorse announced that CEO Hughes had left the Company. In

18   September 2021, Workhorse announced it would halt production and deliveries of its flagship

19   C-1000 electric truck, saying more tests and modifications were needed to ensure it complied

20   with regulatory standards. It also said it would *recall* the 41 vans it had delivered in 2021, further

21   demonstrating that claims of 300-400 units for fiscal year 2020 (and 1,800 for fiscal year 2021)

22   had been totally unfounded. It was also announced that CFO Schrader and COO Willison had

23   left the Company.

24        91.    In sum, through their material misrepresentations, the Individual Defendants

25   misled shareholders and investors to believe that Workhorse had moved beyond the research and

26   development phase of the Company and into mass production, that the Company had a steady

27   backlog and demand for their product, and that there was a strong possibility Workhorse would

28   be granted all or part of the USPS contract, none of which representations were true.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

92.    Workhorse stock currently trades at approximately $3 per share.

**C.  The Securities Class Action.**

93.    In the December 2, 2021 Order Denying in Substantial Part Defendants' Motion to Dismiss in the securities class action, Judge Carney sustained allegations that during the period March 10, 2020 through May 10, 2021, Workhorse and its senior management made false and misleading statements to investors with intent to defraud. The allegations in the securities class action were supported by the first-hand accounts of several confidential witnesses ("CWs") who apparently provided information to counsel for the plaintiffs.

94.    Judge Carney held as follows regarding allegations that the Workhorse defendants made false and misleading statements about the USPS contract:

> Plaintiff plausibly alleges sufficient facts indicating that Defendants could not have genuinely or reasonably believed that Workhorse had a real chance at securing the USPS contract, or that Defendants were aware of undisclosed facts tending to seriously undermine their ability to secure that contract. (*See* FAC ¶¶ 109, 252, 262.)
>
> First, Plaintiff alleges that an undisclosed parking brake failure during prototype testing caused Workhorse's prototype vehicle to roll down an incline and into a ditch, resulting in the hospitalization of a USPS driver who was forced to jump from the runaway vehicle. (*Id.* ¶¶ 8, 14, 51–52, 111, 291.)
>
> Second, Plaintiff alleges that Defendants knew Workhorse was not capable of producing trucks on the scale required to win the contract. (*Id.* ¶¶ 13, 37 [noting that Workhorse's production facility "has no automation or assembly line capabilities that one would traditionally expect to find in a factory"], 53, 101–02, 264.) Indeed, a confidential witness ("CW2") stated that Workhorse's claims that it would be able to produce 300-400 trucks by the end of 2020 was an "absolute lie," as there was "no way" Workhorse would have been able to meet this target because there was "no automation, zero automation." (*Id.* ¶¶ 96, 104.)
>
> Third, Plaintiff alleges that on September 3, 2020, USPS sent Workhorse an undisclosed "deficiency list" identifying various "questions and weaknesses" with Workhorse's proposal, with questions regarding its "prior performance" including the "roll-away incident," its "ability to manufacture efficient and sustainable all-electric vehicles for large-scale commercial delivery," its "production capabilities," and its "cost breakdown." (*Id.* ¶¶ 14–15, 54, 238, 252, 262.)

> And fourth, Plaintiff alleges that on October 21, 2020, USPS sent Workhorse another email with another list of issues related to Workhorse's proposal. (*Id.* ¶¶ 55, 238, 252, 262.) Taking all of these alleged facts together, Plaintiff plausibly alleges that Defendants' statements, as late as October 29, 2020, indicating optimism regarding the USPS contract were materially misleading.

95. Judge Carney further sustained allegations that the Workhorse defendants made false and misleading statements regarding the Company's manufacturing capability:

> Plaintiff alleges that Workhorse produced only 7 trucks in the third quarter of 2020, 18 trucks for the whole year of 2020, and 38 trucks year-to-date by May 10, 2021. (*Id.* ¶¶ 13, 106, 114, 278.) Despite these low numbers, Workhorse claimed over and over that it would be able to produce 300-400 trucks by the end of 2020. (*Id.* ¶¶ 104, 125–28.) As explained, CW2 stated that this claim was an "absolute lie," as there was "no way" Workhorse would have been able to meet this target because there was "no automation." (*Id.* ¶ 104; *see id.* ¶¶ 99–100.) Indeed, "[w]orkers assembled vehicles one at a time on wooden workbenches using basic hand tools that could be purchased at any hardware store." (*Id.* ¶ 127; *see id.* ¶ 95.) When asked if there was a timeline for hiring the workers necessary to increase production, CW2 responded, "hell no," and even if there had been, Workhorse had "no cash flow" with which to perform such hiring. (*Id.* ¶¶ 96, 127.)
>
> * * *
>
> Plaintiff plausibly alleges that the statements regarding Workhorse's manufacturing capabilities were not accompanied by meaningful cautionary language and that Defendants had actual knowledge that their statements regarding manufacturing capability were false or misleading. *See id.* Specifically, Plaintiff alleges that based on Workhorse's production numbers up to that time, and the unautomated state of their manufacturing facility, Defendants knew that there was absolutely no way Workhorse could possibly have met the stated projections. Indeed, Plaintiff alleges that Hughes stated on a March 10, 2020 investor call that as of that day, Workhorse could produce 2 trucks per day, and hoped to increase that number to 5 and then 10 trucks per day. (FAC ¶ 162.) By May 6, 2020, Hughes stated that Workhorse was still working at a rate of 2 trucks per day. (*Id.* ¶ 181.) Nevertheless, Schrader was assuring the public that Workhorse was on track to meet its 300-400 vehicle target as late as October 29, 2020, at a time when fewer than 18 trucks had been made that year. (*Id.* ¶¶ 114, 126, 278).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

20

1       96.     Judge Carney also sustained allegations that the Workhorse defendants made

2  false and misleading statements regarding the Company's purported "backlog" of orders:

> Plaintiff challenges Defendants' false representations that Workhorse had a "backlog" of vehicle orders, which created the illusion of firm customer orders when they were really non-binding expressions of interest. (FAC ¶ 89.) For example, Plaintiff alleges that Hughes told an analyst on March 10, 2020 that UPS "had 1,060 units on order that we are beginning to deliver in anticipation in late Q2 or Q3 this year," even though he knew that Workhorse did not have the capacity to produce that many vehicles, and that UPS had not actually requested delivery of the vehicles. (*Id.* ¶¶ 142, 166–67.) Similarly, Plaintiff alleges that on March 1, 2021, Workhorse announced that it received a purchase order for 6,320 C-Series all-electric delivery vehicles from Pride Group Enterprises, raising the backlog to 8,000 vehicles. (*Id.* ¶¶ 281–82.)

> Defendants argue that Plaintiff fails to allege that the challenged statements were false or misleading when made, as Workhorse disclosed the fact that the backlog orders were subject to conditions and not guaranteed.

* * *

> Plaintiff sufficiently alleges that Defendants' statements, even taken with the caveats presented, were misleading when made. Plaintiff alleges that after the caveats were published, Defendants repeatedly referenced their growing backlog as an indicator that they were a strong, growing company that was able to meet increasing demand. (FAC ¶¶ 136, 143, 285.) Plaintiff alleges that although UPS announced in its 2019 Sustainability Report that it had placed an order for 10,000 electric vehicles from Arrival, making it unlikely that UPS would take delivery of the remaining 950 Workhorse vehicles, Schrader acted as if fulfilling the UPS order was still likely, stating on a March 1, 2021 earnings call that he believed UPS would probably take delivery of their Workhorse trucks in California. (*Id.* ¶ 279.) Plaintiff further alleges that Defendants' announcements of the orders increasing their backlog affected analyst opinions regarding the value of Workhorse stock. (*Id.* ¶¶ 143, 150.) These allegations are sufficient to state a claim.

       97.     Claims for securities fraud were sustained against the Company's entire senior management at the time – its CEO (Hughes), CFO (Schrader), COO (Willison) and Principal Accounting Officer (Ackerman), in addition to the Company itself.

       98.     The securities class action is now in the discovery phase of litigation.

**PROXY VIOLATIONS**

99.     On August 10, 2020, the Company filed its Schedule 14A with the SEC (the "Proxy Statement") in connection with the September 21, 2020 shareholder meeting. Defendants Hughes, Chess, Budde, Samuels, DeMott, and Clark issued the Proxy Statement, filed pursuant to Section 14(a) of the Securities Exchange Act.

100.     The Proxy Statement called for shareholders to approve: (1) the election of eight directors; (2) the issuance of certain shares and related transactions; and (3) the ratification of the Company's independent auditor for the fiscal year ending December 31, 2020.

101.     As with other statements made by the Individual Defendants during the relevant period, the Proxy Statement failed to disclose that (1) Workhorse was not truly competitive in the NGDV process, given the known, numerous, and largely unaddressed issues with its business and operations; (2) Workhorse did not, and would not, at any foreseeable time have the manufacturing capacity to produce anywhere near 300–400 vehicles by the end of 2020; and (3) the supposed orders in the Company's backlog from various third parties did not represent binding commitments to purchase vehicles, but rather were largely  conditional.

102.     The Proxy Statement also failed to disclose (1) deficiencies in Workhorse's disclosure controls that were known to the Board when the Proxy Statement was filed; and (2) disclosure violations known to the Board caused by these deficiencies.

103.     As a direct and proximate result of this wrongful conduct, Workhorse misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Workhorse's recommendation to re-elect certain of its directors.

**DAMAGES TO THE COMPANY**

104.     As alleged herein, securities class action litigation was filed against Workhorse and its officers and directors, and Judge Carney denied in substantial part the motions to dismiss the asserted claims.

105.     The Individual Defendants' conduct has not only caused a massive decline in shareholder value, but has also exposed Workhorse to huge liability to stock purchasers, including huge defense costs.

106.    In addition, Workhorse has incurred other costs, including but not limited to costs incurred from compensation paid to defendants who breached their fiduciary duties.

107.    Workhorse's performance issues also damaged its reputation within the business community and in the capital markets. Workhorse's ability to raise equity capital or debt on favorable terms in the future is now impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

108.    Plaintiffs seek to remedy the foregoing harm through the recovery of monetary damages and implementation of corporate governance reforms.

### DEFENDANTS' INSIDER TRADING

109.    Between July 2020 and February 2021, as the price of Workhorse stock was peaking in response to the Individual Defendants' false and misleading statements, Defendants Budde, Chess, DeMott, Fleming, Furey, Hughes, Mader, Samuels, Schrader, and Willison sold $60.5 million worth of stock at artificially inflated prices as detailed in the table below.

110.    At the time of these sales, these defendants knew that (1) Workhorse was not truly competitive in the NGDV process, given the known, numerous, and largely unaddressed issues with its submissions; (2) Workhorse did not, and would not, at any foreseeable time have the manufacturing capacity to produce anywhere near 300–400 vehicles by the end of 2020, let alone 1,800 vehicles by the end of 2021; and (3) the supposed orders in the Company's backlog from various third parties did not represent binding commitments to purchase vehicles, but rather were largely  conditional.

111.    These sales of stock were highly suspicious in timing and amount, as they all occurred in a period of approximately six months as the stock rose to its highest levels ever in response to Workhorse's bullish comments.

| Name | Number of Shares | Proceeds |
|---|---|---|
| Ackerson | 39,850 | $965,000.00 |
| Budde | 60,000 | $1,195,800.00 |
| Chess | 68,218 | $1,428,218.48 |
| DeMott | 112,450 | $2,675,904.00 |
| Fleming | 304,796 | $6,614,781.05 |
| Furey | 201,862 | $4,407,915.04 |
| Hughes | 568,502 | $14,399,122.23 |
| Mader | 8,000 | $240,000.00 |
| Samuels | 1,099,994 | $24,477,884.93 |
| Schrader | 15,152 | $332,131.84 |
| Willison | 169,920 | $4,825,492.80 |
| *Totals* | **2,648,744** | **$61,562,250.37** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

112.    Workhorse is named as a nominal defendant solely in a derivative capacity.

113.    Plaintiffs will adequately and fairly represent the interests of Workhorse in enforcing and prosecuting its rights and have hired experienced counsel.

114.    Plaintiffs were shareholders at the time of the wrongdoing, have continuously been shareholders since that time, and are currently shareholders.

115.    Workhorse is controlled by its board of directors, which at the time this action was commenced, consisted of ten (10) members, seven (7) of whom are named as defendants herein. Plaintiff has not made a pre-suit demand on the Workhorse board to institute this action, because such a demand would be a futile and useless act, and therefore, is excused.

116.    Demand is excused on non-party director Richard "Rick" Dauch because he is not independent. In its proxy filings with the SEC, Workhorse concedes that Dauch lacks independence as that term is defined in the Nasdaq listing standards. As CEO of Workhorse,

Dauch earns a material portion of his livelihood from his employment at Workhorse, having earned $1 million in salary and $1.25 million in bonus for fiscal year 2021. He would never jeopardize these material sums by taking action against directors who control his employment and his compensation.

117.   Defendants Chess, DeMott, Samuels, Budde, Clark, Dedo and Mader (7 out of 10) breached their fiduciary duties of loyalty by causing or allowing improper statements to be made by Workhorse during the relevant period concerning (a) the Company's ability to compete for the USPS contract, (b) its actual manufacturing capabilities, and (c) its purported backlog of orders from other contracts. These defendants face a substantial likelihood of liability for disclosure violations in breach of their fiduciary duty of loyalty.

118.   Defendants Chess, DeMott, Samuels, Budde, and Mader (5 out of 10) all possessed material, nonpublic information and used that information to benefit themselves by selling their personally held Workhorse stock, in the amounts as detailed above.

119.   These defendants personally enriched themselves by using and/or misappropriating inside information that belonged to the Company. These defendants face a substantial likelihood of liability for insider trading in breach of their fiduciary duty of loyalty, and demand is therefore excused.

120.   Defendants Chess, Samuels, Dedo, Budde and Clark (5 out of 10), as members of the Audit Committee at relevant times, were charged with overseeing the Company's reporting process, including the oversight of "the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct."

121.   Nevertheless, these defendants permitted and/or failed to correct false statements about the allegedly transformative USPS contract and the true state of the Company's production capacity and order backlog, in breach of their fiduciary duties.

122.   The pendency of the securities class action claims for violating the federal securities laws renders it impossible for each of the current director defendants to objectively and impartially consider a stockholder demand as to the wrongdoing alleged herein.

123.    None of the directors could in good faith pursue the Company's claims while defending themselves against claims in another case based on similar facts, and which expose them personally to massive class action liability.

124.    If the Company pressed forward with its rights of action in this case, then the Company's efforts would undercut or even compromise the defense and settlement of the securities class action, making demand futile.

<b>Count I</b>

<b>Breach of Fiduciary Duty</b>

125.    Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

126.    The Individual Defendants, as current or former Workhorse officers and/or directors, owe (or owed) the Company the fiduciary duties of due care and loyalty.

127.    By virtue of their positions as Workhorse directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading statements alleged herein.

128.    Each Individual Defendant was required to: (a) use his or her ability to control and manage Workhorse in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Workhorse rather than his or her own interests.

129.    By their acts alleged herein, including but not limited to causing Workhorse to issue false and misleading statements while concealing material adverse information and engaging in unlawful insider trading in Workhorse stock, the Individual Defendants each breached their fiduciary duties.

130.    In addition, certain of the Individual Defendants engaged in unlawful insider sales of Workhorse stock while in possession of material adverse information.

131.    The Individual Defendants acted in bad faith and violated their fiduciary duties of care and loyalty owed to the Company.

132.    Workhorse has been injured by reason of the Individual Defendants' conduct.

**Count II**

**Contribution and Indemnification**

**15 U.S.C. Section 78u-4(f)**

133.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

134.    Certain of the Individual Defendants named in this Count are named as defendants in the related securities class action pending in the U.S. District Court for the Central District of California, captioned *Farrar v. Workhorse Group, Inc., et al.*, Case No. 2:21-cv-02072-CJC-PV (C.D. Cal.).

135.    The conduct of these defendants has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

136.    The Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

137.    If Workhorse is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omission of all or some of the defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.

138.    The Company is entitled to contribution and indemnification from these defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

139.    As officers, directors, and otherwise, defendants had the power to ability to, and did, control over influence, either directly or indirectly, Workhorse's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

140.    These defendants are liable under Section 21D of the Securities Exchange Act, 15 U.S.C. Section 78u-4(f), which governs the application of any private right of action for contribution asserted pursuant to the Securities Exchange Act of 1934.

Verified Shareholder Derivative Complaint

1

2

### Count III

### Unjust Enrichment

3    141.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

4    above, as though fully set forth herein.

5    142.    By their wrongful acts and omissions, the Individual Defendants were unjustly

6    enriched at the expense of and to the detriment of Workhorse.

7    143.    Plaintiffs, as shareholders and representatives of Workhorse, seek restitution

8    from these Individual Defendants, and each of them, and seek an order of this Court disgorging

9    all profits, benefits, and other compensation obtained by these Individuals Defendants, and each

10   of them, from their wrongful conduct and fiduciary breaches.

11

12

13

### Count IV

### Proxy Violations

### 15 U.S.C. Section 78n(a)(1)

14   144.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

15   above, as though fully set forth herein.

16   145.    Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a)(1), provides

17   that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality

18   of interstate commerce or of any facility of a national securities exchange or otherwise, in

19   contravention of such rules and regulations as the [SEC] may prescribe as necessary or

20   appropriate in the public interest or for the protection of investors, to solicit or to permit the use

21   of his name to solicit any proxy or consent or authorization in respect of any security (other than

22   an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

23   146.    Rule 14a-9, promulgated pursuant to § 14(a) of the Securities Exchange Act,

24   provides that no proxy statement shall contain "any statement which, at the time and in the light

25   of the circumstances under which it is made, is false or misleading with respect to any material

26   fact, or which omits to state any material fact necessary in order to make the statements therein

27   not false or misleading." 17 C.F.R. § 240.14a-9.

28

147.   The Proxy Statement failed to disclose that the Company did not maintain sufficient internal controls to ensure that it made truthful and accurate statements to shareholders. The Proxy Statement was false and misleading when it discussed the Company's adherence to governance policies and procedures due to the Individual Defendants' failures to abide by them and issue false and misleading statements and/or omissions of material fact.

148.   The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2020 Proxy Statement.

149.   The false and misleading elements of the Proxy Statement led to the election and/or re-election of Hughes, Chess, Budde, Samuels, DeMott, Clark, Mader, and Dedo, which allowed them to continue breaching their fiduciary duties to Workhorse.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of Workhorse, demand judgment as follows:

A.   Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' misconduct and breaches of fiduciary duties;

B.   Directing Workhorse to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Workhorse and its shareholders from a repeat of the damaging events described herein, including, but not limited to, adopting corporate governance policies to:

(a) strengthen the Company's controls over disclosure and financial reporting;

(b) strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(c) strengthen Workhorse's oversight of its disclosure procedures; and

(d) prevent or undo self-dealing;

C.   Determining and awarding Workhorse the damages it sustained as a result of the violations set forth above and restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

D.      Granting extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder;

E.      Determining and awarding Workhorse the damages sustained by it as a result of the Individual Defendants' breaches of fiduciary duties, as set forth above, from each of the Individual Defendants, jointly and severally, together with interest thereon; and

F.      Awarding Plaintiffs the costs and disbursements of this action, including reasonable fees and costs to Plaintiffs' attorneys, accountants, and experts.

## JURY DEMAND

Plaintiffs demands a trial by jury on all issues so triable.

Dated: June 22, 2022

*/s/ Martin Muckleroy*
MARTIN MUCKLEROY
MUCKLEROY LUNT
6077 S. Fort Apache Road, Suite 140
Las Vegas, NV 89148
Telephone:    (702) 907-0097
Facsimile:    (702) 938-4065
martin@muckleroy.com

ROBERT C. SCHUBERT (S.B.N. 62684)
WILLEM F. JONCKHEER (S.B.N. 178748)
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone:    (415) 788-4220
Facsimile:    (415) 788-0161
rschubert@sjk.law
wjonckheer@sjk.law

*Counsel for Plaintiffs*